ROTH PRODUCE COMPANY

v.

OHIO DEPARTMENT OF ADMINISTRATIVE SERVICES et al.

2010-Ohio-6393.]

Court of Common Pleas,
Franklin County, Ohio, Civil Division.

No. 10CVH–10–14927.

Decided Nov. 2, 2010.

118

Strip, Hoppers, Leithart, McGrath & Terlecky Co., L.P.A., Nelson E. Genshaft, and A.C. Strip, for plaintiff.

Richard Cordray, Attorney General, and William J. Cole and Jennifer S.M. Croskey, Assistant Attorneys General, for defendant Ohio Department of Administrative Services.

Williams Acosta, P.L.L.C., Victor J. Torres, David A. Domzal, and Adam C. Smith, for defendant Tom Maceri and Son, Inc.

Frye, Judge.

## I. *Introduction*

{¶ 1} Every day, the state of Ohio feeds tens of thousands of people. It does so in settings ranging from adult prisons and youth corrections facilities to the Ohio schools for the blind and the deaf. The diet afforded those who dine with the state includes fresh fruits and vegetables. To obtain quality produce at sensible prices, the Ohio Department of Administrative Services ("DAS") uses one master contract to supply nearly 50 institutions scattered across Ohio. Essentially, any state facility offering food service, other than a state college or university, can use the DAS master contract.

{¶ 2} DAS last awarded a produce contract in late 2009 to Tom Maceri and Son, Inc., of Detroit. It did so using an invitation-to-bid ("ITB") procedure. After the award, a bid protest was lodged with DAS by plaintiff Roth Produce Company. Roth's protest was not directly successful in reversing the award to Maceri, but it did cause DAS to reexamine the documents and procedures used to award the contract. A short time after the contract became effective, DAS terminated Maceri's contract early for the convenience of the state and undertook a new process in which Roth, Maceri, and any other produce suppliers could competitively seek a replacement contract. DAS concluded that terminating the contract awarded to Maceri early and reletting it would permit the state to refine the contracting process in light of Roth's concerns, while in the interim not

interrupting the flow of fresh produce to Ohio institutions.  Unsatisfied, Roth Produce sued.  It asserts in this case that it was the second-low bidder last time around in late 2009 and that once Maceri's contract was terminated, it should have been awarded the balance of that contract without any rebidding.

{¶ 3} The process for replacing the produce contract is well under way. Requests for proposals ("RFPs") are due at DAS on November 8.  The new contract will become effective March 1, 2011.  Unfortunately, Roth Produce did not sue until mid-October 2010.  This court heard the consolidated preliminary- and permanent-injunction requests on Friday, October 22, 2010.  See Civ.R. 65(B)(2).  The matter was expedited with the assistance of all counsel due to the impending deadline for submission of RFPs.  The last evidence in the record, a notice of submission of exhibits, along with a final stipulations and joint exhibits document, was filed October 26, 2010.

## II.  *Findings and Conclusions*

### A.  *General Background*

{¶ 4} In October 2009, DAS issued an ITB for contract No. OT904110 to provide fresh produce.  This is a sizeable and complicated undertaking for the state.  The evidence proved that roughly $3.7 million has been spent with Maceri since January 1, 2010, when their produce contract began.  Complicating factors include the fact that during the term of a multiyear produce contract, a supplier may be required to deal with changes in demand from the state, as well as market-price fluctuations for goods.  The contracting documents warn that a supplier must also anticipate fluctuating populations in state institutions, possible future budget constraints, menu changes, interruptions due to institutional lock-downs, or other unanticipated circumstances.  Of course, important requirements regarding quality and quantity of fruits and vegetables must also be addressed in such a contract.

{¶ 5} As is customary with many government contracts, the bidding documents and specification released in 2009 included a description of the general contract-ing arrangement anticipated, along with instructions and forms for prospective bidders.  The state was required to specify some unusual details.  For example, the case pack and estimated quantity to be used for bid evaluations for broccoli had to be specified as "14 ct. — 1237 cartons."  Prospective bidders were given a list of dozens of fruits and vegetables that the state intended to have available for individual institutions to purchase.  The specification said that a "[f]ailure of the contractor to meet this specification may result in termination of the contract."

{¶ 6} Six produce suppliers bid in 2009.  Maceri was found to be the lowest and best bidder and was awarded a contract originally intended to extend from January 1, 2010, until December 31, 2012.

{¶ 7} In submitting its bid, Maceri failed to use the latest version of an addendum form published by DAS only after advertising for bidders was already underway. Many additional varieties of fruits and vegetables were listed in the addendum but not in the original version of DAS's bid documents. Apparently overlooking publication of the addendum, Maceri did not "price" several dozen items when it initially submitted a bid. On December 1, 2009, DAS recognized the omission and by letter provided Maceri with a lengthy list of produce items (and qualities for them), so that Maceri could update its paperwork and identify laid-in cost for all fruits and vegetables.

{¶ 8} As the state viewed it, this was a "cost-plus contract." A cost-plus contract is one "in which payment is based on a fixed fee or a percentage added to the actual cost incurred." Black's Law Dictionary (9th Ed.2009) 368. Only the supplier's markup over the actual cost of acquiring produce was competitively set in awarding this contract. That approach was practical because, over the long three-year-term of the anticipated contract, produce costs predictably fluctuate with the general agricultural marketplace regardless of which supplier receives the contract. For bidding purposes, therefore, the state sought only confirmation of each supplier's so-called "laid-in cost" (meaning cost to the supplier of each type of fresh produce plus freight, cooling, and other costs to "lay it in" the distribution center). Comparing historical produce costs would apparently do little more than demonstrate that a bidder actually could obtain all the different types of produce that might be needed. Bidders were instructed to supply their laid-in costs item by item if they had made purchases during the week of August 31 through September 4, 2009. If some types of produce were not purchased in that window of time, other means to demonstrate laid-in cost were provided in DAS documents. Thus, while DAS assuredly sought historical laid-in cost figures, they were not seeking firm prices going forward, as might be customary in awarding other competitively bid contracts. Nevertheless, when it did not receive the award, Roth complained that for many items of produce, no historical costs were set forth in Maceri's initial bid. Arguably, DAS could have disqualified Maceri at that point for not following the bidding instructions, but because laid-in cost had little materiality in this cost-plus environment, no disqualification occurred.

{¶ 9} Bidders were also asked to quote a markup to cover their costs of transportation of goods to state institutions, packaging, wages, benefits, and their profit. That markup was to be "a firm, fixed component of the total price" quoted to the state. Markup figures were the point of competition between suppliers.

{¶ 10} Maceri obtained no unfair advantage when it neglected to supply historical, laid-in cost figures for all types of produce with their original bid.

{¶ 11} Roth sensed that that apparent irregularity in Maceri's paperwork afforded it some unfair advantage when it lodged an administrative bid protest with DAS. On the same premise, some months later, Roth also complained to the Ohio Inspector General. It has since been recognized that like Maceri, at least four other bidders were informally notified by DAS in the postbid pre-award period that their paperwork was missing all requested historical laid-in cost information or that they had not included copies of related supplier invoices confirming past prices for produce. At the hearing in this case, there was also a suggestion that minor paperwork irregularities were found in Roth's documents as well, although for present purposes that too is immaterial.

{¶ 12} In addition to the late laid-in pricing information, when Maceri bid in 2009, it was not yet licensed as a foreign corporation with the Ohio Secretary of State. DAS did not view that omission, at the time of contract award, as a significant deficiency in Maceri's bid. This issue is not fatal to Maceri now, since after some miscommunication with the secretary's office, Maceri finally became fully licensed in September 2010. In the future, according to the evidence, unlicensed foreign businesses may not be given such leniency, since as a result of this controversy, DAS has internally reexamined the importance of confirming that bidders met state registration requirements.

{¶ 13} Roth Produce claims in this lawsuit that it actually was the second low bidder in 2009; however, DAS never made a formal finding in that respect. Instead, DAS took Roth's request for internal administrative review seriously, and in a good-faith effort to resolve lingering concern over irregularities in the award to Maceri, DAS terminated the produce contract for the convenience of the state and set about reletting it.

{¶ 14} The early termination date for Maceri's contract was originally supposed to be August 31, 2010. That date was later extended by DAS until February 28, 2011. The court is satisfied from all the evidence that this six-month delay was legitimate and not merely a surreptitious effort to improperly prolong Maceri's allegedly illegal contract. Delay in reletting the produce contract is attributable to the large workload imposed on a small professional contracting staff at DAS. The delay also reflects the complexity of redoing this produce contract. Further, keeping Maceri performing until early next year assures that dozens of types of produce will be available to Ohio institutions throughout the winter months. While the court understands from the testimony that Roth might be able to gear up and begin performance under a substituted produce contract with as little as two weeks' lead-time, DAS simply could not move more quickly to replace Maceri. No abuse of discretion is evident here.

{¶ 15} Beginning some months ago, DAS undertook to revise its produce-contracting documentation and its internal processes. Rather than once again

using an ITB to replace the contract with Maceri, DAS issued a request for proposals. *Cocca Dev. v. Mahoning Cty. Bd. of Commrs.*, 7th Dist. No. 08 MA 163, 2010-Ohio-3166, 2010 WL 2676913, at ¶ 45–49 (and cases cited) recently explained the difference under Ohio law between traditional competitive bidding and the RFP process. The General Assembly exempted certain contracts from competitive-bidding requirements, which may be entered into through an RFP process. Negotiating material aspects of a contract after a bid opening may violate the integrity of competitive bidding but be perfectly proper in an RFP.

{¶ 16} DAS plans to accept RFPs for produce until November 8 and thereafter to award a new contract effective on March 1, 2011. Should difficulty arise that prevents the award of a statewide produce contract, then each individual Ohio institution will probably be left to fend for itself. The court is satisfied from the evidence that such a potentially costly and disruptive outcome is not intended by the contracting officers at DAS.

{¶ 17} Prompted by Roth, the Ohio Inspector General's Office ("the IG") investigated all of this earlier this year. They interviewed several DAS staff members under oath and issued a formal report on September 17, 2010. In it, the IG concluded that "both the bidder and DAS Procurement Services failed to comply with the ITB requirements, resulting in an improper award of a contract to a contractor that was not the lowest responsive and responsible bidder." (As explained below, this quotation from the IG's report is mentioned for general background of the reader, but is not deemed reliable, admissible evidence by the court.)

{¶ 18} Pointing to that IG Report, Roth brought this suit, seeking declaratory and injunctive relief. Roth argues that DAS abused its discretion last year in disregarding omissions from Maceri's bidding paperwork. More important, Roth argues that DAS abused its discretion earlier this year when, having terminated Maceri's contract for convenience, the state did not award the remaining term on the produce contract to Roth. That argument assumes, of course, that Roth actually was fully responsive and responsible in 2009 and fell in second place behind Maceri. As envisioned by Roth, this lawsuit gains it the produce contract without completion of DAS's new RFP process because DAS had no unequivocal legal obligation to begin all over again. Roth claims that it will be irreparably harmed if it is required to once again compete for this lucrative contract.

### B. *Absence of Fraud or Collusion with Maceri and Son*

{¶ 19} One of the touchstones for finding an abuse of discretion is genuine illegality or fraud in the contract-award process. So, at the outset, the court makes it clear that no evidence has been presented showing fraud or improper collusion between DAS and those at Maceri. Maceri's 2009 bid was admittedly

incomplete. However, the exchange of clarifying information and related correspondence after the bid date and before the award was memorialized in public records and was done in good faith. Likewise, DAS's decision last year to be lax in enforcing Ohio's foreign-corporation registration obligations has not been shown to have truly benefitted Maceri in any tangible fashion that requires finding that DAS abused its discretion. Nothing else done or left undone by DAS conferred any genuine advantage on Maceri over Roth or other bidders.

### C. *Opinions Expressed in the IG Report and Testimony*

{¶ 20} All parties acknowledge in their briefs, and this court agrees, that the IG report is not admissible under Ohio's version of Evid.R. 803(8).

{¶ 21} Nevertheless, oral testimony, including a parroting of conclusions in the IG report, was sought from Deputy Inspector General Ron Nichols. Nichols had a lengthy career as a law-enforcement officer before joining the IG's staff. Thus, several conclusions offered at the hearing are probative and admissible under Evid.R. 701. Nichols testified that the IG's investigation uncovered no evidence of any communication between DAS and Maceri between the date that bids were opened in November 2009 and the date of the award that was not documented in writing or that appeared suspicious from a law-enforcement perspective. Nichols also testified that no facts suggesting fraud were uncovered. The absence of evidence is sensibly considered here, just as it would be if this were a criminal case.

{¶ 22} However, efforts to use affirmative opinions of the IG's office as substantive evidence to prove improper conduct are unavailing under the evidence rules. Nichols had no previous experience in government procurement or with the competitive-bidding process. That eliminates his ability to offer expert opinions under Evid.R. 702(B). Moreover, some opinions in the IG report seem to be little more than legal conclusions. Most judicial decisions hold that legal conclusions are not properly the subject of expert testimony. Furthermore, the IG's investigation occurred well after the fact and was truncated. Investigators spoke to no representative of any bidder except Roth Produce. Such limitations on the scope of the IG investigation preclude admissibility of conclusions drawn by the IG on points such as the fairness of the postbid Maceri–DAS communication over laid-in cost, or whether DAS should have completely disqualified Maceri in 2009. Even if the IG's staff had expertise in public contracting, an opinion must be based upon facts or data directly perceived by the witness or otherwise admitted in evidence at the hearing. Evid.R. 703. No such foundation was presented here. See *Elkins v. Veolia Transp., Inc.* 10th Dist. No. 10AP–203, 2010-Ohio-5209, 2010 WL 4216407, at ¶ 37, 41.

### D. *Termination for Convenience*

■ {¶ 23} Roth Produce made legitimate and thoughtful inquiry through DAS after the contract was awarded to Maceri. Indeed, in one meeting with a number of contracting officers from DAS, the representative of Roth Produce brought along (by telephone conference call) a sitting member of the Ohio State Senate.

{¶ 24} DAS understandably took Roth's inquiry about the fairness of the process followed in 2009 seriously, and as a result, it terminated Maceri's contract early and set about reletting it through the RFP process. The court finds that the action taken by DAS was done in a sensible, good-faith response to questions raised by Roth and others. The court relies, in large part, upon testimony by Stephen A. Hunter of DAS. Hunter is a highly qualified, credible, and very experienced public-procurement officer. He had oversight for the 2009 ITB and has been guiding the 2010 RFP process. Hunter's view that the most prudent course for DAS was to proceed as it has is entitled to great weight.

{¶ 25} Experience teaches that DAS might also have found itself caught in litigation had a substitute award to Roth been made in March 2010 when the decision was made to terminate the existing contract with Maceri for convenience. Given the evidence before this court from Hunter about the demands placed upon the small DAS contracting staff from this and other important work, the choice they made to terminate Maceri for convenience and then go back and clarify both process and language while reletting a new contract was sensible. No one contends that the 2009 contract documents did not reserve the right to the state to terminate for convenience. Likewise, nothing assured Roth Produce that the state would not throw out all of the 2009 bids and proceed with an effort at a new contract, just as DAS is doing now with the RFP. DAS did not abuse its discretion in proceeding as it has in this effort to assure that the process of awarding an important, multimillion dollar contract is as transparent as reasonably possible.

### E. *Benefits of Statewide Produce Contracts*

{¶ 26} Fresh produce would seem to be essential to the health and welfare of thousands of people dependent upon state government for food every day. Disruption of that supply pipeline, which might occur by proceeding in another direction, would harm those dependent upon the state for their diet. A secondary concern expressed by DAS, which the court also finds is legitimate, is the potential for widespread disruption of food supplies if individual state institutions had no statewide purchasing contract. Individual institutions would then be forced to go into the marketplace in competition with one another, seeking produce. Such piecemeal acquisition of large quantities of produce by individual institutions could easily result in increased prices for commodities, as compared

to the statewide contract. It could result in unpredictable deliveries and questionable quality control if government institutions scattered across Ohio were individually to procure fresh produce from random local suppliers. Furthermore, under rather cumbersome state purchasing requirements, those individual state institutions would, according to Hunter, be required to petition the state's controlling board for monetary authority to buy produce if a statewide contract was not in place. Finally, Hunter pointed out that because of efforts to consolidate statewide purchasing, many individual state institutions no longer employ contracting officers who could step in and buy large-scale items like produce. Minimizing state staffing is, of course, intended to save taxpayers money; for example, "Doing More with Less" and similar shibboleths abound, particularly as elections draw near. But, paradoxically, such efforts at economy may limit options and result in more cost if unexpected situations like this arise.

{¶ 27} Having all these legitimate concerns in mind, DAS did not abuse its discretion in terminating Maceri's contract for convenience and in then reletting the produce contract through an RFP. Likewise, permitting an extended run-off period with Maceri until Feb. 28, 2011, reflects no abuse of discretion.

### F. *Awarding to Roth, Rather than Rebidding*

{¶ 28} While conceptually it also might have been lawful for DAS to terminate the contract with Maceri and award the balance of the contract to Roth Produce, that alternative would have been fraught with uncertainty. Maceri—or perhaps the third low bidder behind Roth—would no doubt have been the plaintiff in the inevitable lawsuit. Given the relatively small DAS staff available, their ready acknowledgement that Roth's concerns were legitimate, and the overriding need to keep food flowing to Ohio institutions, the decision by DAS to "take this contract in a different direction rather than reversing the award" was not an abuse of discretion. Frankly, given Roth's professed concern about transparency in public contracting, it should applaud this as a sensible choice by DAS.

### III. *Standards for Injunction Requests Involving Public Contracts*

{¶ 29} The court notes four threshold legal points relevant to the procedure followed in this accelerated case. First, the main focus of a permanent-injunction trial, as opposed to the four-factor test customarily used at a preliminary-injunction hearing, is that "instead of the plaintiff proving a 'substantial likelihood' of prevailing on the merits, the plaintiff must prove that he *has* prevailed on the merits." *Great Plains Exploration, L.L.C. v. Willoughby*, 11th Dist. No. 2006–L–022, 2006-Ohio-7009, 2006 WL 3833867, at ¶ 12; see also *Ohio Serv. Group, Inc. v. Integrated & Open Sys., L.L.C.*, 10th Dist. No. 06AP–433, 2006-Ohio-6738, 2006 WL 3718312, at ¶ 11, and case cited therein.

{¶ 30} Second, the analysis in this case must proceed from the assumption that DAS acted correctly. Ohio law holds that "in the absence of evidence to the contrary, public officers, administrative officers and public boards, within the limits of the jurisdiction conferred by law, will be presumed to have properly performed their duties and not to have acted illegally but regularly and in a lawful manner." *Cedar Bay Constr., Inc. v. Fremont* (1990), 50 Ohio St.3d 19, 21, 552 N.E.2d 202, quoting *State ex rel. Shafer v. Ohio Turnpike Comm.* (1953), 159 Ohio St. 581, 590, 50 O.O. 465, 113 N.E.2d 14. Because "[t]he presumption in contract-bidding litigation is that the public authority performed its duties in a regular and lawful manner * * * a disappointed bidder must present clear and convincing evidence to demonstrate that the public authority abused its discretion in awarding a contract." *State ex rel. Associated Builders & Contrs. of Cent. Ohio v. Franklin Cty. Bd. of Commrs.*, 125 Ohio St.3d 112, 2010-Ohio-1199, 926 N.E.2d 600, at ¶ 24. See also *Cementech, Inc. v. Fairlawn*, 109 Ohio St.3d 475, 2006-Ohio-2991, 849 N.E.2d 24, at ¶ 9–10.

{¶ 31} Third, an "abuse of discretion" connotes more than an error of law or of judgment. It implies that a public agency was unreasonable or arbitrary, or even acted unconscionably. See *State ex rel. Associated Builders & Contrs.* at ¶ 43 (Pfeifer and Lanzinger, JJ., dissenting, and cases cited therein.) In this context, the word "unreasonable" has been held to mean "irrational." *Cedar Bay Constr.* at 22. The "discretion [regarding public contracting] is not vested in the courts, and the courts cannot interfere unless it clearly appears that the public authority is abusing the discretion so vested in it." *State ex rel. Associated Builders & Contrs.* at ¶ 22.

{¶ 32} Proof of an abuse of discretion in this context must be by what is termed "clear and convincing evidence." "Clear and convincing evidence' means that degree of proof which will provide in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *Hook v. Hook*, 189 Ohio App.3d 440, 2010-Ohio-4165, 938 N.E.2d 1094, at ¶ 19.

## IV. *Basic Rules for Public Contracting in Ohio*

{¶ 33} In challenges to the award of a public contract, whether competitively bid or let using the RFP process, the legal test is whether it has been proven that a public authority "abused its discretion." The same legal test is applied when a public agency elects to terminate a contract for convenience and then rebid or otherwise relet it. In *Thos. J. Dyer Co. v. Franklin Cty. Convention Facilities Auth.* (1990), 61 Ohio Misc.2d 132, 575 N.E.2d 532, Judge David Johnson held that a public entity did not abuse its discretion when it rejected all bids, in order to afford bidders an equal opportunity to resubmit bids and thereby clear up a potential ambiguity in contracting documents. The same logic applies here.

## V. *Conclusion*

{¶ 34} After considering the weight of the evidence and the credibility of the witnesses, the court finds against plaintiff Roth Produce Company on its request for injunctive relief. Pursuant to Civ.R. 57 and plaintiff's request for a declaratory judgment, the court finds and declares that DAS acted within its discretion in awarding the produce contract to Maceri and Son that began January 1, 2010, and that DAS also acted within its discretion—after considering matters raised in plaintiff's administrative bid protest—in later terminating Maceri's contract for the convenience of the state and reletting it using an RFP process. The RFP process affords all potential suppliers an opportunity to compete on an equal footing and offers DAS an opportunity to resolve concerns raised by plaintiff in its bid protest. An injunction that alters the process that DAS is following here would not be in the public interest. It could expose third parties—state institutions and thousands of people dependent on those institutions—to disruption of their food supply and expose the state to potentially increased financial costs for produce. The risks to the public and the harm to third parties, such as other produce suppliers who will compete using the RFP process, outweigh any difficulty facing Roth Produce Company in responding to the RFP due November 8. The court may not interfere with DAS's plan to relet a new produce contract going forward on and after March 1, 2011, under these circumstances.

{¶ 35} This case is therefore dismissed at plaintiff's costs.

So ordered.